Our next case is Irwin Katz&Associates v. Conceptsin Health 17-1561 With permission of the court, I'd ask to reserve three minutes for rebuttal. That would be great. Thank you, Your Honors. We're here today asking the court to reinstate the jury's verdict in which the jury unanimously found in favor of my client on his claim for breach of the covenant of the good faith and fair dealing. Now, is that what you really want? You want the verdict back. You don't want us to order a new trial based on promissory estoppel or breach of contract. Is that correct? Partially correct, Your Honor. We do want the verdict back. That's important. And what we're asking for is a second trial to explore the breach of contract, reformation, and promissory estoppel claims. That would be double? We're not suggesting that we're entitled to a double recovery, but we are suggesting that it's appropriate to make our client whole to allow him the opportunity to recover. Up to the 4%? The full 4% that the contract entitled him to. And what would that be, the extra amount? It would be, so he was awarded $1,170,000. Right. The 4% would have been just under $1.6 million. 1.6. So what we would ask for in the second trial is likely to achieve whatever verdict we can there and allow the district court to determine how, if at all, I'm sure it would be offset by whatever recovery we have from the first trial. So it would be an additional $530,000. That's correct, Your Honor. Explain to me why you have a case on promissory estoppel. We know the district court dismissed that after she found there was a contract. If she could just play it out for us. Sure, Your Honor. So we have two theories on promissory estoppel. One being the promises that were made in 2007 that around the time the contract was negotiated and entered into. And our argument there would be, if there is no written, an alternative claim, if there is no written contract entitling him to 4% of a sale of the Midnight brand, that there were sufficient promises made to him that he would receive that compensation. So it would be an alternative theory. We also, of course, as the district court itself recognized, have promises made to the plaintiff in 2012 of compensation based on the sale. So language including, I fully intend to provide you with what I believe and any objective person would believe is an unbelievable generous bonus from the proceeds if there is a sale. There were a lot of promises here. It's unusual to me that the district court, in her opinion, criticized counsel for not urging promissory estoppel in the closing when she had really thrown it out perfunctorily at the outset. Absolutely, Your Honor. It almost as though, well, if he argued promissory estoppel, I could have found something. Right, and her exact language, which I pulled out of her opinion, because it is so remarkable. The district court said, it is clear that evidence supporting a promissory estoppel claim was introduced at trial without objection. But yet, and also the rationale for dismissal at the earliest stage of this litigation was nothing more than, we have a contract, therefore this claim cannot go forward. And then, as Judge Vandella pointed out, after the trial we sort of see a real reversal of that approach in thinking that it should have been maybe the primary. So you were pleading in the alternative then? That's correct, Your Honor. I'm sorry. Well, on promissory estoppel, looking at New Jersey law, there has to be a clear and definite promise. It seems like there's a lot of things going back and forth. What was the clear and definite promise here? Where was it? Well, first I want to point out that the issue of whether there was or was not a clear and definite promise was never actually litigated by the parties. We never even got that far. So we suggest that we should go back to the district court and present that. But here's the evidence of the clear and definite promise. So in 2007, we have her saying, we have negotiations that specifically relate to the midnight brand. We also have her making promises to the plaintiff saying, if we are in the fortunate position to be rolling in the dough, I will certainly want to show thanks to you by compensating you in a way that is going to make you happy. You can rely on that. And they were rolling in the dough. Well, my client was not rolling in the dough. But, I mean, the whole sale was, like, $40 million? It was. It was just under $39 million. And so the fact that he would receive compensation in the event of the culminating sale, which was the goal of both parties, was an integral part of his compensation structure from the very beginning. He agreed to accept a lower monthly commission in part because he was entitled to this big payout at the end. And I think it's also notable, as you read this record, the strain on Mr. Katz's time, the amount of time he was to spend, the amount of time he actually spent, the number of times he tried to walk away from this relationship but ultimately was always lured back, I think really shows that he, and the fact that he did stay for this long period of time, much longer than he anticipated, is in part because he was working, he believed, based on her representations and based on the contract, that he was entitled to compensation when they reached their goal. And that's a big part of why he stuck with her until the end. How does the district court err in throwing out the breach of contract claim? Well, in this court's decision in Milan, which applies New Jersey law, as does here, it's clear that as long as the plaintiff can come up with a reasonable interpretation of the contract, that's a question for the jury. Especially when there's extrinsic evidence as to the course of dealing, which you have here. Yes, absolutely. That's admissible. It's not, as we may have learned in law school, where you only look at the contract and then look at extrinsic evidence only later if there's ambiguity. In New Jersey, you look at the whole picture. Evidence of circumstances, this is from the Milan decision, which is applying New Jersey law. Does it matter if there's what they call a zipper clause in there, that everything is in here? The integration clause? Yes. I think that is a fact that is significant. I don't think it precludes our recovery in this case. Again, on the breach of contract claim, we're arguing that the contract itself does entitle him to the 4%. The integration clause is standard in so many contracts, and it certainly never precludes people from bringing all kinds of arguments about what the contract means and everything that happened before. In this case, it's particularly important because the agreement was drafted without the assistance of attorneys. It appears at some point that Ms. Rosenthal didn't really understand what was in the contract or think there wasn't a contract in any event. That's how I read the record as well. Both parties admit and acknowledge that the compensation arm in culminating sale was an integral part of the compensation for Mr. Katz from the very beginning. At some point, he had to actually send her the agreement. That's correct. We believe that that's evidence of her bad faith in the course of this relationship, that she denied that there was an agreement. Really, after this long relationship between the two, not giving him even the slightest benefit of the doubt, when he's presenting to her, remember, we have this agreement, and then she's saying, please send me what you say I have signed and referring to the agreement in quotes as if it doesn't exist. On the good faith and bad faith, I'm assuming that I couldn't find any objection lodged to these jury instructions. Is that correct? That's correct, Your Honor. What do we do with a district judge who says, I made a mistake? How does that work in here? Well, I think in this case, it's easy because she didn't make a mistake. That's our position. She said, the jury charge itself was defective in setting forth the elements of the cause of action. The jury was never charged with the core element of the plaintiff's claim. That's simply not correct. We know that the jury was instructed with the model jury instructions from New Jersey, which were used verbatim. The other side does not dispute that those instructions state the elements of this cause of action. In effect, she said, I shouldn't have given the charge at all. It wasn't that the charge was wrong. Well, she does say, the language I quoted, she talks about the jury charge being defective with respect to the elements. But I think you're right, Your Honor. She was also troubled by, she did not agree with the plaintiff's theory. She did not believe that that theory was actionable, even though she does not clearly say this in her order of granting judgment as a matter of law. But at summary judgment, she acknowledged the very theory that we went forward on, which was that the withholding of information in bad faith violated the covenant of good faith and fair dealing in this case. But the whole reason she thought that the jury instructions shouldn't have been given was that she had found there was a contract. I mean, that there was a specific contract. And she had concluded that the conduct didn't fall within that, so that the idea of good faith and fair dealing didn't fit. But that had never been raised at trial, had it, that concept? That the good faith and fair dealing was exclusive of good faith and fair dealing? That claim went to trial for how many days was this trial? I want to say it was three days. I mean, the case went to trial on this, and no one said, wait a minute, this doesn't fit. And she wakes up in the Rule 50 motion, and I don't even think it's really well stated there, and says, wait a minute, it didn't fit. This seemed to me unusual. I think it's unusual, and I think it does fit. The breach of covenant of good faith and fair dealing in New Jersey is broader than the contract itself. It explicitly allows parties to bring terms and conditions into the contract that are based on their reasonable expectations that are not in the letter of the contract. So last night, as preparing for this case, I located a case that I think there's some language really crystallizing this principle. It's not stated in the briefs, but I did bring it to the attention of my adversary. It's Seidenberg v. Summit Bank, Superior Court of New Jersey Appellate Division, 791A2-1068. And that specifically says, the covenant permits the inclusion of terms and conditions which have not been expressly set forth in the written contract. The central premise of the implied covenant is the enhanced status of the party's reasonable expectations. So the law in New Jersey does not specifically tailor the breach of the covenant to the language of the contract and exactly what the person was entitled to under the contract. It's an implied covenant, and it's intended to cover the reasonable expectations of the parties which may not be in the agreement itself. Did the district court get it right in terms of applying the proper standard for the Rule 50B motion? Or A for that matter? That's a good question, Your Honor. It's not an issue we've raised on appeal, whether the exact standard was correct. But in terms of looking at whether the jury was correctly instructed on the law, whether the evidence was sufficient. I mean, I think she stated the standard correctly. But do I think that she drew all reasonable, the district court, drew all reasonable inferences in favor of the plaintiff? No, I think that her, that the district court, It's really that no reasonable juror, right? No reasonable juror could have found as the jury found. Yes. That's correct, Your Honor. And in order to come to that conclusion, we have to give every justifiable inference in favor of the plaintiff, according to any rational basis for the verdict. The goal should be to honor and preserve the jury's verdict whenever possible, and it is possible in this case. Your Honor, I see that my time has expired. Okay, we'll get you out of the room. Thank you. Thank you. Good morning. Good morning. May it please the Court, I'm Jeffrey Deitchman, and I represent the appellees, Concepts in Health, Inc., and Holly Rosenthal. In the first instance, the primary flaw to their good faith and fair dealing argument is that the appellant takes the position that a breach of the covenant could be demonstrated by bad faith alone. Counsel, let me ask you a question. I have never seen a situation where a jury is instructed, no objection is raised to the jury instructions, jury deliberates, comes back with a finding, and the district court gets up one morning and says, I was wrong, and undoes the jury verdict. Can you cite to me a case where that has happened and we have upheld a Rule 50 motion? I don't have a case offhand, but I would like to explain what happened and why it happened and what the judge's thinking was. I don't think she woke up one morning because I think she carefully thought about this entire process. We took the position, as Judge Serka pointed out, that it never should have went to the jury as a threshold matter, that there was insufficient evidence. The reason it survived summary judgment was because the district court recognized that there was a potential claim that was advanced by the plaintiff that Ms. Rosenthal deliberately structured the transaction as an asset deal in order to avoid making payments to him. But the judge didn't reach that conclusion. The judge said, I should not have given this jury instruction, not that there was insufficient evidence. Well, I think she said both. And focusing on the model charges, we have no problem with the model charges per se, and I think the problem arose with the part that the judge crafted that was not part of the model charge. But you didn't object to it. You didn't say it doesn't exist. We built the entire charge. It should not have gone to the jury. We made a summary judgment motion. We made a motion at the end of the plaintiff's case. We renewed that motion at the end of the trial. We preserved all of our objections to all of those instructions. That claim should not have gone to the jury. And you can show me where that specific instruction was objected to at the time of trial. I would be interested in that. Well, I will tell you this, that the transcript shows that we made a Rule 50 motion at the end of the plaintiff's case. No. The judge reserved that. We renewed it at the end of the case, and we made the argument that the covenant of good faith and fair dealing should not have gone to the jury. And the reason the judge said it shouldn't have gone to the jury was she told the jury that the plaintiff's claim is that Ms. Rosenthal purposefully withheld information from him regarding the consequences of an asset sale. And the judge explained in her post-trial decision that was misleading because it implied if the jury found that she purposely withheld that information, then there could be liability. But that would have no effect on his entitlement, if any, to share in the proceeds. That was defined by the contract. In other words, what's the difference if she told him something or didn't tell him something? There's no causation. You cannot say, Your Honor, that but for the fact that she didn't tell him about the consequences of his own contract, that caused him not to receive benefits under the contract. That was a function of the contract. And the judge, probably better than I can, explained all that at pages 77 to 78 of the record, of the joint appendix rather, that's part of her post-trial decision, and she explained why that part of her charge was flawed, and it never should have went to the jury. So we don't believe that there is a basis for the good faith claim. And if you look at the cases cited by the judge and decided by the New Jersey Supreme Court, they always involve some kind of a reliance. Don't you think that was shown by the facts here? Don't you think the jury observed this the whole time there was testimony, that she kept saying, You know, I reward if you're loyal, I will give you a bonus. And she never raised the fact that, Oh, guess what? This is an asset sale, not a stock sale, so you're not entitled. I mean, after a specific conversation, Mr. Katz sent her a letter saying, We have two issues. One of them is the percentage, and the other one is the attorney's fees. It's clear that she had not said to him, Oh, by the way, this is an asset sale, so you're not entitled to anything. She was leading him on. Oh, no. I mean, that's the way the jury could have perceived it. Aren't they free to do that? Not under the facts of this case. It was insufficient facts to go to the jury. What reliance was there on his part? What causation was there? The reason he didn't get a participation in the sale was because of the way the contract was framed and because it was an asset sale. Well, but maybe the judge, you know, improperly construed what the contract was actually all about, given all the confusion as to what it was about. There was no confusion when they negotiated this contract, because when you look at the chronology of the negotiations, Mr. Katz originally requested the sale of Midnight or its products. He requested the sale of the company or the sale of Midnight, which was the main product that they had. She didn't agree to that, Ms. Rosenblum. She crossed it out. And I cite these smoking gun emails. The reason I say it's a smoking gun is because he sends an email and he recognizes that he wants that back in, because if it's not in and she only sells some products but not the company, he doesn't participate. He understood that. But these are all arguments. But we have a jury verdict. And unless no reasonable juror could have found a breach of good faith on her part, the verdict has to be upheld. Isn't that the case law? That's the law. But I agree with the district judge that no reasonable jury could have found liability because there was no evidence of causation and there was no evidence of detrimental reliance. At best, Your Honor, there was only evidence of bad faith. But whatever she said or didn't say had no impact on his benefits under the consulting agreement. That's the lack of causation. What's the difference what she said to him or withheld from him with respect to the contract? And he made key admissions, key admissions at the trial and before the trial that clearly shows that the contract was unambiguous and he understood it. He admitted that Ms. Rosenthal did not agree with his draft when he inserted sell the company or the Midnight Brand. So he knew that there was no meeting of the minds about that. He admitted that after he reviewed the draft containing the proceeds of sale definition that she put in there, he had questions about loans, about what happens after two years. He never questioned that definition or its key elements. He admitted in his July 16th smoke and gun email that the reason he wanted or its products was to avoid a situation where a product was sold and he doesn't participate. So he understood what would happen if that wasn't in there. So for all of this, he should get nothing or should we go back and have a trial on the breach of contract and promissory estoppel? Because the judge seemed to think that the promissory estoppel case should have been pursued. He was forgetting that she had dismissed it. But promissory estoppel was not presented by the plaintiff at trial. No, because she had dismissed the case. She had dismissed that claim. She dismissed promissory estoppel early on because everybody agreed, including the plaintiff, that there was a written consulting agreement that governed the relationships between the parties. Even at the end, in the letter that you cited where he made his demand in December of 2012, he referred to the specific consulting agreement, not some other promise. And let's not confuse that with the idea that just because he didn't get what he wanted under the agreement doesn't mean there wasn't an agreement. Everybody agreed the agreement existed and covered the relationship, the business relationship between the parties that encompassed the sale of the business or a product down the road. And unfortunately for Mr. Katz, who understood the agreement, under that agreement he was not entitled to participate in the sale. But she did say she was going to give him a bonus anyway. And she didn't give him anything. In that same email, in that same email that was cited by my adversary, she also said, quote, I am not making any commitments here. Promissory estoppel requires a clear and definite promise. That's the very antithesis of a clear and definite promise. And that part wasn't tried. So there was no promissory estoppel that surrounded the alleged promise of a bonus that was tried. Why wasn't he allowed to plead in the alternative and move ahead on that? The reason he can't plead in the alternative is because once there is an admission that there is a written contract, an agreement, there's a written agreement between the parties that covers the space that involves this business relationship, promissory estoppel is not why. That's what the judge found at the beginning of the case, and at the end of the case there was no basis to allege promissory estoppel based on subsequent promises because that was never tried to the jury. They never asked for instructions on it. They never argued that to the jury. And the same evidence came in because it was evidence of the background. And when we talk about Mylan, the judge entertained all of this evidence about the background and the circumstances and weighed it and made her determinations. And all those admissions, by the way, that he made a trial, I want to emphasize all those admissions, and they're not part of the joint appendix, but they're part of the record, all those admissions were made at his deposition that was given to the judge on the summary judgment motion attached to my declaration, and she even cited a number of his admissions and cited his deposition in her summary judgment decision. So she certainly considered all of the extrinsic circumstances, and she certainly considered all of the evidence. As far as reformation is concerned, there was certainly no unconscionability here because the parties were of equal bargaining power. He was a sophisticated business person with 50 years in the consulting industry, and there was no substantive unconscionability because the agreement wasn't so one-sided as to shock the conscience of the court. He made a million dollars, as he admitted, based upon the monthly payments that he was made that were made to him every month from the outset. But he was supposed to get something from the sale, and that seems clear. Your Honor, and that's what the jury obviously thought. What he gets or doesn't get is defined by the contract. Well, but the judge didn't consider any extrinsic evidence as to intent. She looked just at the four corners, and under New Jersey law, you can look at other things. Shouldn't the jury have actually decided what the agreement was? Well, I strongly disagree with that based on the record. On the summary judgment phase, she looked at everything. All the e-mails were put in. All the depositions were put in. My question is not the judge, but should not the jury have been able to consider that? All of that was presented to me, jury. I made objections, and they were overruled. And all of his expectations and background and all of those e-mails. But the breach of contract had already been thrown out by that point. Yes, but she allowed it in on the covenant of good faith and fair dealing. I objected to it because the breach of contract was thrown out. My objections were overruled, and she said it had come in as the background for his expectations. But maybe there should be a new trial on the breach of contract aspect because the jury should have decided what the four corners of the contract consisted of. Not if the contract is unambiguous, which the judge found in the summary judgment motion. I don't think ambiguity is necessary under New Jersey law. She made that ruling based on all the extrinsic evidence. She didn't make that ruling based on the four corners of the contract, and that's important to understand. She made it based on all the extrinsic evidence. It's not reproducing the joint appendix, but it's in the record, and the judge refers to that in her 27-page summary judgment opinion. She talks about the back and forth and the negotiations, and it's clear. How can he possibly have expected to participate in the sale of just the Midnight brand when he, during the negotiations, proposed that I would participate if the company or the Midnight brand is sold, and that's not accepted by her. So he knows there's no meeting of the minds. It's not accepted. It's totally unreasonable, and if you look at the history of the negotiations, it's crystal clear that he understood this contract, that the contract was unambiguous, and that he was not entitled under the contract to participate in any percentage of the sales proceeds. Again, the law of New Jersey, there was no reliance. He didn't make any investments. He didn't spend any money. He didn't forego any legal rights. Well, but from a factual standpoint, he forwent a lot of time and effort, and he devoted a lot of time and effort. Yes, sir. He was paid for that. He didn't like the legal leave. Well. The only measure, the measure of damages. But there was two parts to it. It was going to be paid on an ongoing basis and then paid from the sale of the assets. No, not from the sale of the assets. All right, the sale of the company. But, yeah, he did have a lawyer draft this. Well, he said he did. He said he reviewed it with his lawyer. But whether he did or didn't, the contract was clear, and because he understood the contract, as you could see from the negotiating history, he was not allowed to participate in the sale of the assets because the entire company was not sold. I mean, she pinned that down. After he kept requesting all the products, all the midnight brand, she pinned down every possibility. The ownership of the company had to be sold. The midnight brand had to be sold. All of the other brands had to be sold. That's the only way, Mr. Katz, you can participate in this sale. And he knew it, and the contract was unambiguous, and that's what the court found. And the court found that based upon all the extrinsic evidence and the history of the negotiations, and I don't believe that should be reversed or overturned. It's a solid finding. Realistically, the midnight brand was really the company, wasn't it? I mean, you had these other things that were unproductive. They were just going to be tossed anyway. That was the whole idea, Your Honor, that she didn't want to allow him, who didn't have any risk or equity in the company, to have a waiver. But he had helped build it. He helped build the sales, not the entire company. But she didn't want him to get a waiver, and she'd be stuck with all these liabilities, which she was. She was stuck with the bum brands and a million dollars in returns and all that other stuff. But she got $39 million out of it, so she's not exactly hurting. Okay. And at the time they negotiated the contract, the midnight brand was the company. He admitted that company meant concepts and health. He admitted that. He admitted that at his deposition. He admitted that on summary judgment. He admitted that at the trial. Company is a lot more than just one brand. And if you said you have to sell the company and you have to sell midnight brand, and then the same, that's superfluous. So what's the point of structuring it that way or writing it up that way? Obviously they meant different things, and he understood they meant different things. I see my time has expired.  Thank you. Thank you, Your Honors. I think what's easy to lose sight of is the standard of review that we're here on, both the review of the jury verdict and the review of the summary judgment decision, which is that we have to draw all of the reasonable inferences in favor of the non-moving party or the verdict winner, which in this case is the plaintiff. We heard a lot about, you know, fact-based argument that the plaintiff understood the whole, all the way along, that he would never share in a sale of assets or a sale of the midnight brand. And we strongly disagree with that, and there's certainly evidence in the record from which a reasonable jury could conclude that the parties agreed to compensation on the sale either of concepts and health or the midnight brand. So my adversary was referencing some early contract negotiations in July 2007 involving the language or its products, and skips directly from there to the written agreement, which does not include that language, inferring from all of that that the plaintiff understood all along that he was never entitled to payment on the sale of the midnight brand. That ignores what happened in September 2007. We have evidence in the record, and this is outlined in our briefs, that Ms. Rosenthal sent Mr. Katz a draft of this agreement that provided for compensation on the sale of concepts and health, including, or the midnight brand. The parties had reached, Mr. Katz accepted that. As of September 2007, they had reached agreement on that point, and it was effectively over. Now, Ms. Rosenthal unilaterally changed or added language into the final draft called Proceeds of Sale that unduly confused overly complicated language, which was unnecessary, and which plaintiffs reasonably believed did not actually represent a change from what their prior agreement, the prior draft in 2007. So, viewing the facts in the light most favorable to Mr. Katz, as we must here on appeal, it's clear that he had a reasonable expectation that he would share in the sale of the midnight brand that's relevant not only to the breach of contract claim, but also to the review of the jury verdict. Just to get to some of the other points that my adversary raised, emphasizing the idea that it was the action of the contract that caused him not to receive any compensation on the sale, like it was some independent act of the contract, when, in fact, there's only two people involved here. There's one person who structured the sale. There's one person who decided not to pay Mr. Katz this compensation, and that's Ms. Rosenthal. It's not some independent act of the contract that deprived him from compensation. Now, importantly, they make the argument that if she had been truthful, straightforward with him, if she had acted in good faith in this 2012 time period when he was trying to ask questions about the contract, that nothing would have happened. He never would have been able to be entitled to the 4%. We respectfully disagree with that strongly. This record shows that Mr. Katz had a huge amount of leverage in this time period. He was absolutely necessary to the business at that time, to helping her achieve this sale. He didn't use this leverage to protect himself in writing because of her bad faith conduct, because of her promises, I fully intend you to provide you with what I believe and any objective person would believe is an unbelievably generous bonus from the proceeds if there is a sale, and the promise which is intended to induce reliance. People deserve extraordinary payouts when they show loyalty from the start to the finish. An extraordinary payout is consistent with someone who is loyal and puts the interests of the business first from start to finish. She induced him to stay with her, to continue working until the end. He did, and he was entitled to a payout upon the sale that ultimately took place. Your Honor, I see that my time has expired, unless you have any further questions.  Thank you. Thank you very much, Counsel. We thank all Counsel for their excellent arguments, both written and oral. Could Counsel order a transcript and split the costs between you? We would appreciate that. If we could go off the record for a few minutes, we ask Counsel to approach me so we can thank you more personally and do some other business. If we could maybe go off the mics as well.